Okay, counsel. Good morning, Your Honor. If it may please the Court, my name is Paul Gattone, and I represent the appellant in this matter, Mr. Frank Borquez. I'd like to reserve a minute or so, if I could, please, for rebuttal. You may. You may. Just watch the clock. Your Honor, as Your Honors are aware from the briefings, this appeal stems from a Section 1983 litigation in the District Court of Arizona in Tucson. My client had filed suit based on actions that took place at the tail end of a New Year's Eve party on the morning of January 1, 2007. When he filed the litigation, there was initially was a motion for summary judgment that was filed by the defense that was denied, based in part on qualified immunity that was denied by the Court. We proceeded to trial in April of last year, and after a four-day trial and almost a full day and a half of deliberations, the jury ruled in my client's favor. As you're aware from the excerpts of record, they came back with a verdict of $100,000 for the excessive force and $50,000 for the false arrest case. Your Honor, the issue then arose that at the request of the defense, there were interrogatories, as you see from the excerpts of record and the verdict forms. The one in contention here is that, number one, do you find that Frank U. Borquez grabbed the arm of Defendant Fabian Pacheco as they encountered each other near the front door of 1366 West Caye Rancho Rio on January 1, 2007. The jury came back with a verdict, as you understand, in favor of Mr. Borquez, although they answered in the affirmative on the first interrogatory and in the negative on the interrogatory connected with the false arrest verdict. At the end of the trial, counsel made a rule – well, he made a Rule 50A motion at the end of the plaintiff's evidence, which was denied. He made a verbal 50B motion and was denied, and he was directed by the court to file a written motion, which was then briefed and we opposed it. I don't think we need to get bogged down in the procedural history. You've hit the issue that concerns me. Yes, Your Honor. I apologize for that. You may want to find out what I'm going to ask. Oh, of course. Yeah. That's a good idea. Okay. So the jury finds that, in fact, Mr. Borquez grabbed the arm of Defendant Fabian Pacheco. Yes, Your Honor. When I read your briefs, I got the impression that there was no bodily contact. Well, it was always our contention that there was no – No contention, but a jury that you're relying on found, after hearing all the evidence, to the contrary. So why isn't that binding on us? It's a fact-finding by the jury, and therefore, viewing this matter under the question of whether there was unreasonable or excessive force, don't we look at a circumstance where the police officer has been – has had his arm grabbed by Mr. Borquez? Well, Your Honor, I think if we look at the circumstances, certainly the jury determined that my client did grab the officer's arm, but also they saw fit to rule in his favor and to determine that it was excessive force. That may be, but this is – But if we – We have questions of qualified immunity and excessive force. Well, we have to realize, Your Honor, if the officer under the circumstances of a reasonable officer would think that it was the right thing to do and – To push? To push if my arm's been grabbed and I've got somebody in custody and somebody comes up and grabs my arm and all he does is push away? Well, Your Honor, I think it's under the circumstances. It was more than a push. It was excessive that even if physical force – I'm not saying that Mr. Borquez would have been involved in the altercation inside the house with the police. If Mr. Borquez had been involved in the altercation inside the house with the police, he would not have been the one to be held accountable for the fact that he had been grabbed by Mr. Borquez. He would have been held accountable for the fact that he had been grabbed by Mr. Borquez. Could you explain how that's possible, though, when they come in contact with a police officer?  I think that Mr. Borquez was not impeding his line of leaving the house. That Mr. Borquez, my client, was not violent, was not aggressive, was not yelling. Wait a minute. Not aggressive? What do we make of a jury find that says he grabbed the arm? Well, Your Honor, I think that he did. According to the jury finds that he did. Grabbed. He didn't touch. He didn't say touch. They found grabbed. Right. Grabbed was what they were offered, Your Honor, in the interrogatory. Did you try the case? I'm sorry? Did you try the case? I did, Your Honor. So you signed off on the interrogatory? I objected, Your Honor, and the court put it in nonetheless. So you objected to the interrogatory altogether or you objected to the word grabbed? I objected to the interrogatory and to the word grabbed. His Honor, the underlying and the trial judge took out some of the verbiage that I had originally objected to but did not take out the word grabbed. Your Honor, under the circumstances, I would say, and there's plenty of case law that says even if force is necessary, it has to be force that's reasonable under the circumstances. So Mr. Borges comes up, an elderly man comes up and touches the officer's arm. Grabbed. Okay. Grabs the officer's arm, Your Honor. The officer doesn't say, excuse me, sir, let go of me. I'm in the process of arresting your son. He didn't say anything. He – Sergeant Pacheco testified that he didn't say anything prior to shoving Mr. Borges with enough force to send him backwards, hitting the wall and then falling to the ground. It might have been one thing to keep walking. It might have been one thing to say, sir, let go of my arm or I'm arresting your son. Let go of my arm or I'll have to use force. Or if he had walked away, he had a clear line to the – to his vehicle. The area was well lit. He knew what was going on. And also he had encountered Mr. Borges earlier, my client. He had opened the door for the officers when they came. The door had been locked after my client's son came outside. My office – my client went and got a key to allow the officers in. So my client was not involved in anything. He was cooperative. Certainly, we realize that every shove is not actionable. But this was force that was unnecessary under the facts. Even if a grab of the arm, the thing to do with the elderly man would have been let go of me, sir, or just to continue walking. It was our belief that it was done in anger. And an officer in Sergeant Pacheco's position, a senior officer, should have known better than to apply that sort of force under the circumstances. Well, how long after making the request would the officer have to wait before shoving the citizen? Well, it might be instantaneous. But the issue here, Your Honor, is that the officer never made the request. He never requested – the officer never said anything to my client, didn't say, sir, let go of me. He just – when my client came up, he grabbed his arm and the officer immediately shoved. So there was no – it might have been instantaneous if the officer had taken the – had taken the time to ask my client that. But the officer himself testified that he didn't say anything to Mr. Borges before shoving him. Do you have a case that supports the argument that before an officer may respond to physical contact from a citizen, they have to ask the citizen to cease the physical contact? Well, Your Honor, I do have cases, and we've cited them in our brief, that talks about the fact that force is only justified when and where there is a need for force. That's the grand case. That's very general. I mean, the Supreme Court has told us we have to have a certain level of specificity when we're talking about excessive force cases. So do you have a case that specifically addresses the situation where a citizen physically touches an officer and the officer has to first ask the citizen to cease the contact before responding in time? Well, two things, Your Honor. First off, I'm not sure that we need to have a specific case. Even the Ashcroft v. Kidd said that it would not require a force contact. Why don't we know that, counsel? Answer the question that's posed, not how you'd like to reframe it. I'm sorry, Your Honor, if I'm not certain that I have a specific case that says the What's the closest case? What's the closest analogous case that you've got? Well, I think that I would – I guess I would point out two things, Your Honor. First, that I cited the Blankenhorn v. City of Orange that says that setting questioners at the time of the encounter with the plaintiff whether the State of the law gave fair warning that the treatment of plaintiff was unconstitutional. What were the facts in Blankenhorn? The Blankenhorn was, again, I don't believe it was actually similar, Your Honor. I think that it was, again, it was someone who had – somewhat similar who had objected and I'm not completely certain, Your Honor, but who had objected in a similar circumstances and force was used against them. Your Honor, the only thing that I would also add to is that – That's where they gang-tackled the plaintiff? I'm sorry, Your Honor? That's where they gang-tackled him and put him under restraints on his ankles and punched him? I believe so, Your Honor. Your Honor, the other case, I had also cited the Graham case that the force is only justified where there's a need for force. Counsel, look, I don't want to belabor the point. Yes, Your Honor. We do know we get a lot of these excessive force cases and we really do understand the law. I know that. We're not trying to be antagonistic, trying to find out your best case. We're trying to find out, as best you can give us, something that takes it down. As Judge Rawlinson said, from the level of generality, which the Supreme Court has recently told us in Al-Kid, we have to do. So if the best you can do is come down to a blanken horn, okay, that's fine. But then it's the facts of the case. And what we're looking for is what would a reasonable police officer have understood was necessary in the context of where, as you say, I mean, you've got an elderly man who's been cooperative, but he comes up and he grabs the police officer. That's what we're trying to understand. Your Honor, in my brief, I had also cited Santos v. Gates, which is a Ninth Circuit case that says that even though some force may be justified, the amount can still be excessive. Okay. And I think that that is the principle. We'll take a look at that. You're over time, so. Yes, sir. I'll give you a minute for rebuttal if you need it. Good morning. May it please the Court. My name is Mark Christensen. I'm from the Tucson, Arizona, City Attorney's Office. I represent Sergeant Fabian Pacheco. I think I'll just address some of the things that the Court raised and that counsel for the appellant spoke to. Can you just give us what was the reason for the very strong shove of this man who had been cooperative? And, you know, just why was it? What was the officer's explanation as to why he didn't say, get your hands off me? Sure. I don't know that it was a particularly strong shove at trial. I was also trial counsel in this matter. Sergeant Pacheco testified, I think without contradiction, that when he was grabbed on his right arm, he pushed away with the palm of his hand pushing away as he was approached from his right side. He did not turn and push with two hands or even turn and lean into it with one arm. I think the thing that is significant is that Sergeant Pacheco also testified that if he had spoken, if he had said, sir, please step back, let go of my arm, he testified that that would have been all in one motion. And, in fact, all in one sequence would have essentially been at the same time. In fact, the arrestee, the plaintiff's son, testified that everything happened real quick. I think that was his word. And they all met there just outside the front door of the house all at the same time. And Sergeant Pacheco also testified that the person who came up from him, we have to remember now it was after 2 o'clock in the morning. There was much in the trial testimony about how dark it was, whether the lights helped, so on and so forth. It was dark outside. The person that came up to him from outside after he'd been inside, he did not immediately recognize as the person who had gotten the key and let them in. And that makes sense because Sergeant Pacheco and Officer Olivares were at the door and presumably from behind when the key was obtained by the plaintiff. They had their backs to him. They really didn't interact with him or Pacheco didn't interact with him much during the time that they were outside assessing the situation. The officers went inside or Pacheco actually stood at the door for a time and observed what was going on, went inside then. The appellant was outside by his truck or outside and did not interact with the officers. So Pacheco really didn't recognize the appellant as the person who let them in. The son was completely under the custodial care of the police officer at the time? He was, Your Honor. He was in handcuffs. He didn't pepper spray. Sergeant Pacheco testified, of course, that at that point as they were going out of the house, his primary purpose was in continuing to be able to control the son who had to fight on the floor to get him handcuffed after Sergeant Pacheco had to pepper spray him. And he also testified that as he's taking an arrestee out, anyone who's been pepper sprayed, he needs to be able to keep control of that person so that that person doesn't fall, doesn't injure himself, doesn't otherwise attempt to run or whatever a person might do. So he was under control for the moment. If he were approached by somebody else and he was grabbed on the arm, then the control clearly becomes less likely or perhaps less likely. Or less complete. Or less complete, exactly. I'd like to also add that Sergeant Pacheco also testified that he did not perceive that he necessarily had a clear path once he was approached from his right side and he was grabbed on the arm. And that makes sense, and I think the jury saw that also, even though the appellant testified, who had his back to the clear path, that Sergeant Pacheco had a clear path. And the son testified, who had been pepper sprayed in the eyes, that Pacheco had a clear path. It was Pacheco's perception, reasonable, we submit, that once grabbed he, in fact, did not have a clear path. So can you help us understand, since this jury interrogatory went with a two-part inquiry, how the case was presented to the jury, such that if they're finding that there was a grab, they can still nonetheless have the option to award damages, which they did, $100,000. So everything you've been saying sounds as if the jury concluded, yes, technically he grabbed the arm, but all the things you've been saying doesn't justify it, and they award a fairly sizable amount. They do award a sizable amount. The way the trial judge fashioned the verdict form and the interrogatory, and we had a jury question to that effect, do we have to find excessive force first before we answer the interrogatory? And those were the instructions. And, in fact, if you, when we read down, it says we, upon our oaths, find that for the plaintiff and against the defendant on the claim of excessive force and award the amount. At that point, it's a determination by the jury that, in their view, excessive force was used and the damages were $100,000. Then the factual finding is whether or not the grab was made by the appellant. And that's where we get to the issue of qualified immunity, which, of course, is a decision for the trial court to make and not for the jury to make. So the qualified immunity rests on the issue of whether Sergeant Pacheco was grabbed. Then I think the way the trial court stated its finding in granting the Rule 50B motion, it said that once that determination is made, it's up to the trial court to assess whether or not Sergeant Pacheco's mistake was reasonable about whether he could apply that amount of force. And the trial court found that, in fact, the any mistake in judgment was reasonable.   And that's the way the trial court said it was reasonable. And I think that's the way the trial court said it was reasonable with the course reading. Okay. Thank you. Thank you, Your Honor. I think we don't have any more questions. Thank you, Your Honors. Just briefly, I hope that I had cited the Blankenhorn case as one that talks about the state of the law as, again, whether excessive force under the circumstance of the reasonable officer would have had fair notice that the force employed was unlawful. Your Honor, I think one other thing that I wanted to stress for the Court, and I'm and adequate to support the jury's conclusion, even if it's possible to draw a contrary conclusion from the same evidence. I don't – it certainly was clear that there was significant evidence besides this grab to justify the fact that the jury awarded a verdict of excessive force. They didn't. The jury didn't decide the issue of qualified immunity. They do not, Your Honor. But I think that – I'm certain that the judge does. But under the case law, I believe that that doesn't mean under Rule 50B that he just says, well, I disagree with the jury. If there's substantial evidence to support their verdict. I'm sorry. Did the judge do that here? He just said, I just disagree. I'm sorry, Your Honor? Is that what the district court did here? Just said, I just disagree with the jury? Yes, Your Honor. I think that that's clear what happened, that it was the grab was significant to the judge, but not significant to the jury. That they – when the jury looked at the totality of the circumstances, that they believed that despite this grab and despite the interrogatory, that the – that force used was still excessive and justified an award in Mr. Borges' favor, as you said, not an insignificant amount, $100,000. We believe that that's what the court has done here, is said, I disagree, based on all of that evidence. Counsel, has the false arrest issue been waived? Your Honor, the false – we were a little bit confused, actually, by the false arrest claim, because as you saw in the excerpt. It wasn't brought up squarely in the opening brief. Well, it was – in the opening brief, we brought up and said that we didn't understand the basis for it, because if you saw from the excerpts of record that the trial court judge didn't even address the circumstances of the excessive – of the false arrest. He just said – he just kind of mentioned it offhand and said, I'm directing a verdict in both. But what's really caused our confusion, Your Honor, is that in the trial – at the time of trial, the jury, as you saw from the excerpts of record – and I'm sorry, just let me grab it – answered the interrogatory in the negative for the false arrest. It was, do you find that Borges used physical force to knowingly obstruct, impair, or hinder, et cetera. So again, there doesn't seem to be any basis for the court to have awarded the – or to grant the qualified immunity for the false arrest verdict, which, again, was not insignificant, $50,000. There was no basis. According to counsel's argument, if the interrogatory is controlling, they answered no to the interrogatory for the false arrest. So there doesn't seem to be any basis there for an argument. We would also argue, Your Honor, that the interrogatory is not controlling. It is the jury's thought that despite that, that there was substantial evidence to support a verdict in plaintiff's favor. Certainly, the trial court should not be able to overturn that just based on the fact that the judge found the interrogatory to be especially convincing in light of all the other evidence that was presented to the jury. The jury took a substantial amount of time in considering it, too, and brought back a verdict in plaintiff's favor. All right. Thank you, counsel. Thank you, Your Honor. All right. Thank you. The case is submitted. We appreciate the argument. And the next case and final case for the day is
judges: Mills, Fisher, Rawlinson